GUTRIDE SAFIER LLP
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIKHAIL GERSHZON, BIANCA JOHNSTON, and DANIEL WINE, individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PAPA JOHN'S INTERNATIONAL, INC.,<br><br>Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

THE PARTIES...................................................................................................................3

JURISDICTION AND VENUE ........................................................................................3

FRAUDULENT CONCEALMEANT AND TOLLING...................................................4

SUBSTANTIVE ALLEGATIONS ...................................................................................5

    A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ......................................................5

    B.    Defendant Falsely Informed Users That They Could Reject the Website's Use of Cookies. ...................................................................................................11

    C.    The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website. ..........................................................23

        1.    Facebook Cookies. ...............................................................................23

        2.    Google Cookies.....................................................................................26

        3.    LiveRamp Cookies................................................................................30

        4.    Adobe Cookies......................................................................................32

        5.    Additional Third Party Cookies. ..........................................................33

    D.    The Third Parties Intercept User Communications While in Transit. ...............38

    E.    The Signaling and Addressing Information Intercepted by the Third Parties...............................................................................................................42

    F.    The Private Communications Collected are Valuable. ......................................43

PLAINTIFFS' EXPERIENCES .....................................................................................45

CLASS ALLEGATIONS ................................................................................................53

CAUSES OF ACTION ....................................................................................................55

    First Cause of Action: Invasion of Privacy...................................................................55

    Second Cause of Action: Intrusion Upon Seclusion.....................................................58

    Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ...................................................59

    Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ...............................64

    Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation............66

    Sixth Cause of Action: Unjust Enrichment....................................................................68

PRAYER FOR RELIEF ..................................................................................................69

CLASS ACTION COMPLAINT

Plaintiffs Mikhail Gershzon, Bianca Johnston and Daniel Wine (collectively, "Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Papa John's International, Inc. ("Defendant"). Plaintiffs' allegations against Defendant are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their personal knowledge.

## INTRODUCTION

1.      This Class Action Complaint concerns egregious violations of consumer privacy and breach of consumer trust in violation of California law. When consumers visit Defendant's website (www.papajohns.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they do not have to "Accept" cookies, they can choose to adjust their "Cookies Settings" as shown in the following screenshot:



2.      Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that enable those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3.      Even after users elect to adjust their cookies settings to reject all non-strictly required cookies, Defendant nonetheless caused numerous third parties—including Meta Platforms, Inc. (facebook.com), Google LLC (DoubleClick), Live Ramp Holdings, Inc. (liadm, pippio.com and rlcdn.com), Adobe, Inc. (demdex.net), Amazon.com, Inc. (amazon-adsystem),

- 1 -

Microsoft Corp. (AppNexus and LinkedIn), Yahoo, Inc. (analytics.yahoo.com), PubMatic Inc. (pubmatic.com), The Trade Desk (adsrvr.org), Comscore, Inc. (Scorecard Research), IPONWEB GmbH (bidswitch.net), TripleLift, Inc. (3lift.com), OpenX Technologies, Inc. (openx.net), Index Exchange, Inc. (casalemedia.com), Magnite, Inc. (rubiconproject.com), Everest Technologies, Inc. (everesttech.net), and more (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and eavesdrop on users' private communications on the Website.

4.     Contrary to users' express rejection of all non-strictly required cookies and tracking technologies on the Website, Defendant nonetheless caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These third-party cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data— including whether a user is located in California.

5.     The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6.     This type of tracking and data sharing is exactly what the Website visitors sought to avoid when they clicked the "Cookies Settings" button and rejected all non-strictly required cookies (including Targeting, Performance, Functional and Social Media Cookies) in the Privacy Preference Center. Defendant falsely told Website users that it respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving

- 2 -
CLASS ACTION COMPLAINT

clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated Website users.

## THE PARTIES

7.      Plaintiff Mikhail Gershzon is, and was at all relevant times, an individual and resident of San Francisco, California. Plaintiff Gershzon intends to remain in California and makes his permanent home there.

8.      Plaintiff Bianca Johnston is, and was at all relevant times, an individual and resident of Big Bear City, California. Plaintiff Johnston intends to remain in California and makes her permanent home there.

9.      Plaintiff Daniel Wine is, and was at all relevant times, an individual and resident of Sacramento, California. Plaintiff Wine intends to remain in California and makes his permanent home there.

10.      Defendant Papa John's International, Inc. is a Delaware corporation with its headquarters and principal place of business in Louisville, Kentucky.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

12.      The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

13.      Further, the Private Communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

14.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of

- 3 -

CLASS ACTION COMPLAINT

California, including within this District.

15.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

**FRAUDULENT CONCEALMEANT AND TOLLING**

16.     The delayed discovery rule applies to Plaintiffs' claims. Plaintiffs were unaware that, despite declining or rejecting all non-strictly required cookies and tracking technologies on the Website, Defendant nonetheless caused third-party cookies to be sent to their browsers, stored on their devices, and transmitted to the Third Parties along with their private user data. Plaintiffs could not reasonably have discovered this conduct at the time of their visits to the Website because it occurred through hidden, technical processes not visible to ordinary users. Nothing about Plaintiffs' experiences on the Website would have alerted a reasonable user that their selections were not being honored. Plaintiffs lacked the technical expertise and specialized tools necessary to determine whether the Website honored their opt-out selections or instead continued transmitting their data notwithstanding those selections, and they did not discover Defendant's conduct until a later investigation revealed it.

17.     On or about April 10, 2023, Plaintiffs' counsel notified Defendant that it was engaging in the conduct alleged herein, including causing third-party cookies and corresponding user data to be stored on consumers' devices and transmitted to third parties despite users' rejection of all non-strictly required cookies and tracking technologies. Despite this notice, Defendant did not disclose this conduct to users or modify its representations in the Website's cookie banner or Privacy Preference Center regarding users' ability to reject such data sharing.

18.     Despite exercising reasonable diligence, Plaintiffs were unaware of Defendant's conduct because Defendant affirmatively represented that users could decline or reject non-strictly required cookies and tracking technologies while simultaneously concealing that such tracking would occur regardless of users' selections. This combination of misrepresentation and omission prevented Plaintiffs from discovering their claims earlier. Defendant is not prejudiced by the timing of this action, as it has long been on notice of the conduct at issue, including through the April 10, 2023 demand letter describing substantially similar claims. These

- 4 -
CLASS ACTION COMPLAINT

circumstances, including Defendant's concealment and misleading representations, warrant the tolling of the statute of limitations.

**SUBSTANTIVE ALLEGATIONS**

**A.      Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.**

19.      Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website server to identify the origin of the request and return the response.

20.      An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

21.      As a result, Defendant knew or should have known that the devices used by Plaintiffs and Class members to access the Website were located in California.

22.      Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party

- 5 -

CLASS ACTION COMPLAINT

resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

23.    The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

24.    First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

25.    A third-party cookie is set by a third-party domain/webserver (e.g., www.facebook.com; doubleclick.net; amazon-adsystem.com; etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

26.    As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

CLASS ACTION COMPLAINT

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

CLASS ACTION COMPLAINT

27. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

28. Defendant is a national pizza restaurant company that, through a combination of company-owned and franchised locations, operates and supports thousands of pizza restaurant locations worldwide. Defendant markets and sells its pizza and related food products directly to consumers, including through the Website, which allows users to obtain information about its products and place orders for pickup or delivery.

29. As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

30. Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the Website's software code, and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

- 8 -

CLASS ACTION COMPLAINT

31.    Defendant explained the third-party cookies it used on the Website as follows in its Privacy Policy:

**Cookies, Pixels, and Other Tracking Technologies:** We collect information through tools including cookies and pixels, as well as industry standard tools that record information provided in routine network communications. To learn more about these tools and how you can control them, you can visit: https://support.mozilla.org/en-US/kb/cookies-information-websites-store-on-your-computer. You may also review our Cookie and Ad Notice here: https://www.papajohns.com/cookies/ for more information.[1]

32.    Defendant provided further information about the cookies it used on the Website as follows in its "Cookie and Ads Notice" available on its Website:

**Cookies:** A cookie is a small text file that is placed on your computer when you visit a company's website. Cookies typically encrypt data about you which can only be read by the company that placed the cookie there. Cookies can enable you to log into a website faster if you've visited it before and can give companies better insights into your behavior on their site, including how long you stay on their site and which pages you visited.

**Pixels:** A pixel is a tiny, invisible piece of code that is installed on websites. Pixels collect certain pieces of information that can identify site visitors, including information such as a visitor's IP address, and monitor web traffic and other site visitor behavior.

**How does Papa Johns use cookies and pixels on our site?**
We use cookies, pixels, and other tracking tools in a variety of ways to further our relationship with you. We collect Personal Information of site visitors ("Personal Information") over time and across different websites when visitors use this website, read our emails, or otherwise engage with us through a computer or mobile device. Here are some key purposes of our cookies and pixels:

- To recognize new or past customers.
- To remember your preferences and facilitate online ordering.
- To assess performance and improve our sites.
- To serve you with interest-based or targeted advertising (see below for more on interest-based advertising)
- To observe your behaviors and browsing activities over time across multiple websites or other platforms.
- To better understand the interests of our customers and our website visitors.
- To diagnose and fix technology problems.
- To improve security and prevent fraudulent activity.

We also engage third party service providers and vendors (our "partners") to collect Personal Information this way on our sites, who may also use these types of tools.

---

[1] Papa John's Website Privacy Policy (Effective Date: November 1, 2023) (current version available at https://www.papajohns.com/privacy-policy.html) (the "Privacy Policy"). Defendant has subsequently updated its Privacy Statement but, based on information and belief, this version was in effect at the time of Plaintiffs' rejections of cookies on the Website.

- 9 -

CLASS ACTION COMPLAINT

**INTEREST-BASED ADVERTISING**
**How does Papa Johns use interest-based advertising on our sites and other sites and platforms?**
We and our partners display interest-based advertising using in formation gathered about you over time across multiple websites or other platforms, which may include apps. Interest-based advertising, also referred to as "online behavioral advertising," includes ads served to you after you leave our website, encouraging you to return. They also include ads we think are relevant based on your shopping habits or online activities. These ads might be served on websites or on apps. They might also be served in emails. We might serve these ads, or third parties may serve ads. They might be about our products or other companies' products.

**How do we gather relevant information about you for interest-based advertising?**
To decide what is relevant to you, we use information you make available to us when you interact with us and our partners. We gather this information using cookies, pixels, and other tracking tools described above. For example, we or our partners might look at your past purchases or browsing behaviors. We might look at these activities on our platforms or the platforms of others. We also work with third parties who help gather this information. These third parties might link your name or email address to other information they collect, such as past purchases made, or online usage information.[2]

33.     Under the heading "**REQUIRED DISCLOSURES FOR RESIDENTS OF CALIFORNIA**," Defendant provided information about the categories of cookies used on the Website as follows in the Cookies and Ad Notice:

**Cookie Categories**
The list below provides the following information about cookies used on the Papa Johns websites in the prior 12 months: (i) cookie categories along with their purposes; (ii) information about essential cookies (i.e., "Strictly Necessary Cookies"), which are always activated; and (iii) categories of third-parties to which personal data is disclosed via cookies. The categories of third parties to which we may sell or share Personal Information include promotional partners, online advertising networks, marketing companies, and social media companies.

**Strictly Necessary Cookies**
These cookies are necessary for the website to function and cannot be switched off in our systems. They are usually only set in response to actions made by you to request our services, such as setting your privacy preferences, logging in to your account, or filling out forms. You can set your browser to block or alert you about these cookies, but then some parts of the site may not work.

**Performance Cookies**
These cookies allow us to count visits and traffic sources so we can measure and improve the performance of our site. They help us to know which pages are the most and least popular and see how visitors move around the site. If you do not

---

[2] Papa John's Cookies and Ad Notice (Effective Date: February 15, 2023) (available at https://www.papajohns.com/cookies/) (the "Cookies and Ad Notice").

CLASS ACTION COMPLAINT

allow these cookies we will not know when you have visited our site and will not be able to monitor its performance.

**Functional Cookies**
These cookies enable the website to provide enhanced functionality and personalization. They may be set by us or by third party providers whose services we have added to our pages. If you choose to block these cookies, then some or all of these enhanced services may not function properly.

**Targeting Cookies**
These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant advertisements on other sites. These cookies are based on uniquely identifying your browser and internet device. If you choose to block these cookies, you will limit targeted advertising from us.[3]

34.    Defendant further explained the third-party cookie categories it used on the Website as follows in its Privacy Preference Center:

**Strictly Necessary Cookies**
These cookies are necessary for the website to function and cannot be turned off. They are usually only set in response to actions made by you to request our services, like setting your privacy preferences, logging in to your account, or filling out forms. You can set your browser to block or alert you about these cookies, but some parts of the site may not work.

**Targeting Cookies**
These cookies are set by social media services and enable you to share our content. They can track your browser across other sites and build a profile of your interests. They may impact the content and messages you see on other sites. If you block these cookies, you may not be able to use or see these sharing tools.

**Performance Cookies**
These cookies enable enhanced site functionality and personalization. They may be set by us or third party providers whose services we have added to our pages. If you block these cookies, some or all of these enhanced services may not function properly.

**Functional Cookies**
These cookies allow us to count visits and traffic sources to measure and improve performance, and to keep the website running smoothly. They tell us about a page's popularity, how visitors move around the site and any errors that pop up. If you block these cookies, we will not be able to understand if you run into issues, and cannot use your session data to make improvements to the website.

**Social Media Cookies**
These cookies may be set by our advertising partners who use them to build a profile of your interests and show you relevant advertisements on other sites. If you block these cookies, then advertising may be less relevant to your interests.

**B.    Defendant Falsely Informed Users That They Could Reject the Website's Use of**

---

[3] Cookies and Ad Notice.

**Cookies.**

35.     When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "Papa Johns uses cookies and other tracking to enhance your experience and analyze performance and traffic. We may also share information about your use of our site with our social media, advertising and analytics partners. Click 'Accept All' or continue browsing to accept. Review our Cookie Notice to learn more." The banner then purported to provide users the opportunity to "Accept All" cookies or adjust "Cookie Settings" as shown, in the following screenshot from the Website:



36.     Plaintiffs and other Website users who click or select the "Cookie Settings" button are presented with the Privacy Preference Center depicted in the screenshots below. Defendant represented to users in the Privacy Preference Center that it "store[s] cookies on your browser to collect information related to you, your preferences, or your device for site functionality and a more personalized experience…" and that users could "opt out of allowing certain types of cookies…"



CLASS ACTION COMPLAINT

37. The Privacy Preference Center allowed users to click a button next to the categories of cookies to deselect those cookies, and therefore reject "Targeting Cookies," "Performance Cookies," "Functional Cookies," and "Social Media Cookies." Users who rejected those cookies could click "Confirm My Choices" to accept only the Strictly Required Cookies, which users could not reject. After Website users clicked the buttons next to the "Targeting Cookies," "Performance Cookies," "Functional Cookies," and "Social Media Cookies" to deselect them, and clicked the "Confirm My Choices" button, indicating their choice and/or agreement to decline or reject all non-strictly required cookies and tracking technologies in use on the Website, they could then continue to browse the Website, and the Privacy Preference Center and the popup cookie consent banner disappeared.

38. Defendant's popup cookie consent banner and Privacy Preference Center led Plaintiffs, and all those Website users similarly situated, to believe that they declined or rejected all non-strictly required cookies and tracking technologies, including "Targeting Cookies," "Performance Cookies," "Functional Cookies," and "Social Media Cookies." The banner and Privacy Preference Center further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Cookie Settings" button and rejecting all non-strictly required cookies.

39. Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other Website users clicked the manage "Cookie Settings" button in the banner and deselected all non-strictly required cookies in the Privacy Preference Center, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website.

- 14 -
CLASS ACTION COMPLAINT

40.     Nevertheless, even after receiving that notice, Defendant caused the Third Parties' tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

41.     In particular, when users rejected all non-strictly required cookies in the Privacy Preference Center, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

42.     Some aspects of the operations of the Third Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies being transmitted from a Website user's device and browser to the Third Parties even after the user rejected all non-strictly required cookies in the Website's Privacy Preference Center.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

- 18 -

| Name | Status | Domain | Cookies |
|---|---|---|---|
| cms?partner_id=AMAZON&ex=gemini | 302 | ups.analytics.yahoo.com | 2 |
| cms?partner_id=AMAZON&ex=gemini | 302 | cms.analytics.yahoo.com | 2 |
| ecm3?id=y-hKbV1r1E2pHqtCTDNeD2TITzOm25a... | 200 | s.amazon-adsystem.com | 2 |
| ecm3?ex=telaria.com&id=1b7bd598795b4a34aed... | 200 | s.amazon-adsystem.com | 2 |
| ecm3?ex=visualiq&id=15500f04-0341-492c-bdb6... | 200 | s.amazon-adsystem.com | 2 |
| sync?_origin=1&redir=true&uid=bZwE15MPRFG6... | 302 | ups.analytics.yahoo.com | 2 |
| ecm3?ex=yahooHMT&id=bZwE15MPRFG6KfV11... | 200 | s.amazon-adsystem.com | 2 |
| ecm3?ex=bluekai.com&id=$_BK_UUID | 200 | s.amazon-adsystem.com | 2 |
| tap.php?v=4222&nid=1512&put=5dd6642c-aea8-... | 200 | pixel.rubiconproject.com | 2 |
| img?mop_seq=0:30&mt_cb=189349&mop_top= | 200 | pixel.mathtag.com | 2 |
| ibs:dpid=269&dpuuid=5dd6642c-aea8-4400-bb0... | 200 | dpm.demdex.net | 2 |
| cms?partner_id=SEMAS&gdpr=false&sInitiator=in... | 302 | ups.analytics.yahoo.com | 2 |
| cms?partner_id=SEMAS&gdpr=false&sInitiator=in... | 302 | cms.analytics.yahoo.com | 2 |
| ?p=204&g=101&buid=5dd6642c-aea8-4400-bb00... | 204 | loadm.exelator.com | 2 |
| sync?uid=5dd6642c-aea8-4400-bb00-0263145f1... | 204 | ups.analytics.yahoo.com | 2 |
| check?partner_id=2989&partner_device_id=5dd6... | 200 | pixel.tapad.com | 2 |
| user-registering?dataProviderId=183&userId=5dd... | 200 | ads.stickyadstv.com | 2 |
| getuid?https://sync.mathtag.com/sync/img?mt_e... | 302 | ib.adnxs.com | 2 |
| img?mop_seq=0:30&mt_cb=701017&mop_top= | 200 | pixel.mathtag.com | 2 |
| ibs:dpid=269&dpuuid=5dd6642c-aea8-4400-bb0... | 200 | dpm.demdex.net | 2 |
| getuid?https%3A%2F%2Fuipus.semasio.net%2F... | 302 | ib.adnxs.com | 2 |
| generic?ttd_pid=semasio&ttd_tpi=1 | 302 | match.adsrvr.org | 2 |
| ?p=204&g=101&buid=5dd6642c-aea8-4400-bb00... | 204 | loadm.exelator.com | 2 |
| img?mt_id=99&ns=xx&bcdv=1 | 200 | pixel.mathtag.com | 2 |
| sync?uid=5dd6642c-aea8-4400-bb00-0263145f1... | 204 | ups.analytics.yahoo.com | 2 |
| getuid?https://sync.mathtag.com/sync/img?mt_e... | 302 | ib.adnxs.com | 2 |
| img?mt_id=99&ns=xx&bcdv=0 | 200 | pixel.mathtag.com | 2 |
| 1000.gif?memo=CP-EFhIvCisIARDIDRokNWRkNj... | 307 | idsync.rlcdn.com | 2 |
| tap.php?v=4222&nid=1512&put=5dd6642c-aea8-... | 200 | pixel.rubiconproject.com | 2 |
| img?mt_id=99&ns=xx&bcdv=1 | 200 | pixel.mathtag.com | 2 |
| appnexus?ttd=1&anid=33165646383452792468&tt... | 302 | match.adsrvr.org | 2 |
| getuid?https%3a%2f%2fmatch.adsrvr.org%2ftra... | 302 | ib.adnxs.com | 2 |
| rubicon?gdpr=0 | 302 | match.adsrvr.org | 2 |
| generic?ttd_pid=rightmedia&yahoo_id=y-fVHbk_l... | 302 | match.adsrvr.org | 2 |
| appnexus?ttd=1&anid=33165646383452792468&tt... | 302 | match.adsrvr.org | 2 |
| getuid?https%3a%2f%2fmatch.adsrvr.org%2ftra... | 302 | ib.adnxs.com | 2 |
| google?g_uuid=&gdpr=0&gdpr_consent=&ttd_tdi... | 302 | match.adsrvr.org | 2 |
| google?g_uuid=&gdpr=0&gdpr_consent=&ttd_tdi... | 302 | match.adsrvr.org | 2 |
| js?mt_id=1371562&mt_adid=207665&mt_exem=&... | 200 | pixel.mathtag.com | 2 |
| px?id=1039309&seg=14905259&t=2 | 302 | secure.adnxs.com | 2 |
| 1990123160507510784 | 200 | acuityplatform.com | 2 |
| js?mt_id=1371562&mt_adid=207665&mt_exem=&... | 200 | pixel.mathtag.com | 2 |
| px?id=1039309&seg=14905259&t=2 | 302 | secure.adnxs.com | 2 |
| 1990123160507510784 | 200 | acuityplatform.com | 2 |
| match-result?id=8bb138bc0446417c9a4df9a0136... | 200 | tags.w55c.net | 2 |
| ?cbe=10814694113&gaid=684483513.1680649808 | 200 | d.agkn.com | 3 |

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

- 21 -

CLASS ACTION COMPLAINT

43. The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third party websites while the user visited and interacted with Defendant's Website at https://www.papjohns.com. The screenshots depict only network traffic occurring *after* the user rejected all cookies using the Privacy Preference Center. As shown above, despite the user's rejection of all cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.facebook.com; doubleclick.net; amazon-adsystem.com; and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined or rejected all non-strictly required cookies and tracking technologies in the Privacy Preference Center. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's rejection of all cookies.

44. Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

45. As users interact with the Website, even after clicking or selecting the "Cookies Settings" button and rejecting Targeting Cookies, Performance Cookies, Functional Cookies, and Social Media Cookies in the Privacy Preference Center, thereby declining or rejecting the use of non-strictly required cookies and similar technologies, as well as the sale or sharing of the user's personal information with third parties, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party

- 22 -

CLASS ACTION COMPLAINT

cookies cause the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

46.    The Third Parties' code that the Website causes to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

**C.    The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website.[4]**

**1.    Facebook Cookies.**

47.    Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users reject all non-strictly necessary cookies, to and from the **facebook.com** domain. This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[5] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

---

[4] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected after the user had rejected all non-strictly necessary cookies.
[5] https://www.facebook.com/privacy/policies/cookies/.

48.      Cookies enable Meta to track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. For example, the Website causes the following data to be sent to Meta when a user views a page on the Website:



49.      The "ev" parameter corresponds to the "event." In this case, it is a "PageView," indicating that the user viewed a page on the Website.

50.      The "cd" parameter is a custom parameter that Defendant configured for use with Facebook. Here the custom parameter is "order_id," revealing to Facebook the user's order id on the Website.

51.      The "c_user" cookie shown above enables Facebook to identify a specific user when they are logged in to their account. The "c_user "cookie stores a user's unique ID, which is associated with their Facebook profile. This ID enables Facebook to track user interactions on

- 24 -

its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities.

52.     Further, along with all of this data, the Meta software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Meta:

| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/ 111.0.0.0 Safari/537.36 |
|---|---|

53.     The "user-agent" corresponds to the device and browser that the user has used to access the Website.

54.     In addition, the Meta software code causes the user's IP address to be transmitted to Meta.

55.     Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience. In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies enable Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[6] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[7]

56.     The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).[8]

57.     Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This

[6] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect
[7] https://allaboutcookies.org/what-data-does-facebook-collect.
[8] *Id.*

- 25 -
CLASS ACTION COMPLAINT

includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

### 2.     Google Cookies.

58.     Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users reject all non-strictly necessary cookies (including advertising and analytics cookies), to and from the **doubleclick.net** domain. This domain is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[9] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[10] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies enable its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites

[9] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).
[10] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

- 26 -

CLASS ACTION COMPLAINT

within Google's ad network.[11]

59.     Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[12] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

60.     Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[13] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[14]

61.     Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors,

---

[11] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).
[12] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).
[13] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).
[14] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

CLASS ACTION COMPLAINT

(viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[15]

62.    For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Google's domain, at https://stats.g.doubleclick.net:

---

[15] See About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=63867067566957652-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

- 28 -

CLASS ACTION COMPLAINT

63.    The "cid" parameter above refers to "Client ID." It contains a unique identifier for the user's browser and device, that enables Google to link the user to their interactions with the website.[16]

64.    The "tid" stands for "Tracking ID."[17]

65.    Google documentation confirms that the "IDE" cookie is used for advertising. Specifically, it is "used to show Google ads on non-Google sites."[18]

66.    The user's user-agent information—discussed above with respect to Facebook—is also sent to Google:

| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/ 111.0.0.0 Safari/537.36 |
|---|---|

67.    Finally, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

68.    Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

69.    Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of

---

[16] *See, e.g.,* https://cheatography.com/dmpg-tom/cheat-sheets/google-universal-analytics-url-collect-parameters/; https://www.analyticsmarket.com/blog/how-google-analytics-collects-data/; https://www.owox.com/blog/use-cases/google-analytics-client-id/.
[17] *See, e.g.*, https://digitallysmart.club/analytics-for-nonprofits/how-google-analytics-collects-data/.
[18] https://policies.google.com/technologies/cookies?hl=en-US.

CLASS ACTION COMPLAINT

their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[19]

70.     Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[20] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

**3.     LiveRamp Cookies.**

71.     Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to reject non-strictly necessary cookies, to and from the **pippio.com**, **rlcdn.com** and **liadm.com** domains.[21] These domains are associated with LiveRamp, a software company that allows businesses to combine customer data from various online and offline sources and leverage that data for marketing and analytics purposes.[22]

---

[19] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

[20] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

[21] *See* LiveRamp Product and Service Privacy Notice (available at https://liveramp.com/privacy/service-privacy-policy/).

[22] *See* https://liveramp.com/privacy/service-privacy-policy/#section1a; *see also* LiveRamp Data Marketplace (available at https://liveramp.com/data-marketplace/).

CLASS ACTION COMPLAINT

Pippio.com cookies are used to create an online identification code for the purpose of recognizing users' devices and tracking their user behavior.

72.    These cookies enable LiveRamp to obtain and store at least the following user data: browsing history, visit history, website interactions, user input data (such as email address), demographic information, interests and preferences, device information, user identifiers, and geolocation data (including IP addresses), on the Website. The unique user identifier enables LiveRamp to sell a user's unique data for use in online and cross-channel advertising (including targeted advertising and email marketing).

73.    LiveRamp explains in its Privacy Notice the user data it receives from pippio cookies installed on "partner websites" and how it uses (and monetizes) that data as follows:

> [The website] partner may sell or share personal information collected from you, such as your email, cookies set on your browser, IP address, or information about your browser or operating system, with LiveRamp. LiveRamp uses this information to create an online identification code for the purpose of recognizing your device. This code may be placed in our partners' cookie and for use in online and cross-channel advertising (including targeted advertising and email marketing), or LiveRamp may connect it to LiveRamp's own 3rd-party cookie and other identifiers. In addition, by associating an email address with a cookie, LiveRamp and third parties can link your browsing activity across different websites and other applications and services to your specific device associated with the email address, identifying the user behind the device. This means that, even when browsing unrelated sites, your online activity can be connected to you for advertising and other marketing-related purposes, including email marketing and offline advertising...
>
> The personal data and identifiers we collect (for instance, a cookie ID) may be linked to other personal data and identifiers through known associations and/or identity resolution (for instance, an identifier derived from or associated with a hashed email address and LiveRamp cookie 1234 might be associated with partner cookie 5678), and shared with advertising partners and other third party advertising companies for the purpose of enabling interest-based content or targeted advertising throughout your online and offline experiences (e.g., web, TV [MVPDs], connected TV, mobile applications, email marketing and other media). These third parties may in turn use this identifier to link demographic or interest-based information you have provided in your interactions with them. Note that LiveRamp does not itself provide the service of targeted advertising (sometimes referred to as "cross-context advertising") but, rather, processes and transfers data to an advertiser's advertising platform so that platform can provide targeted advertising services...[23]

---

[23] *Id.*

- 31 -

CLASS ACTION COMPLAINT

**4.    Adobe Cookies.**

74.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to reject non-strictly necessary cookies, to and from the **demdex.net** domain This domain is associated with Adobe Inc.'s Audience Manager, a data management platform, Adobe's Marketing Cloud, and Adobe's Experience Cloud Identity Service, a service which provides a universal, persistent ID to identify visitors across all Adobe products.

75.    These cookies are used to assign a unique identifier to each site visitor, which enables Adobe to consistently recognize and track users across different sessions and domains (i.e., cross-site tracking) and collect and synchronize user data to comprehensively observe and evaluate user behavior online.[24] These cookies enable Adobe to obtain and store at least the following user data: (i) user identifier; (ii) website interactions; (iii) browsing history; (iv) visit history; (v) interests and preferences; and (vi) session information.[25]

76.    Adobe aggregates this cookie data with other data from multiple channels and devices, including web analytics, CRM systems, and e-commerce platforms, to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics, create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.), and to enable targeted advertising and marketing analytics.[26]

77.    Finally, the data sent to Adobe includes, in addition to cookies, the user's user-agent information and IP address.

---

[24] *See, e.g.,* Adobe Experience League: Adobe Analytics cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics); *see also* Adobe Experience League: Audience Manager cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager).
[25] *See, e.g.,* Adobe Audience Manager User Guide: Data Collection Components (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/system-components/components-data-collection).
[26] *See, e.g.*, Adobe Audience Manager User Guide: Understanding Calls to the Demdex Domain (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/demdex-calls); Adobe Experience Cloud Identity Service overview (available at https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview); Adobe Audience Manager Features (available at https://business.adobe.com/products/audience-manager/features.html); *see also* Audience Manager Overview (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/aam-overview).

- 32 -

CLASS ACTION COMPLAINT

**5.      Additional Third Party Cookies.**

78.      Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to reject all non-strictly necessary cookies, to and from other domains, including (i) amazon-adsystem.com; (ii) adnxs.com; (iv) analytics.yahoo.com; (v) pubmatic.com; (vi) adsrvr.org; and (v) scorecardresearch.com.

79.      The **amazon-adsystem.com** domain is associated with Amazon's advertising services. Amazon utilizes cookies to collect data on user interactions with websites (including browsing behavior and preferences) to perform advertising and personalization functions, i.e., to assist Amazon in delivering advertisements tailored to user interests. Further, the cookies perform analytics functions to enable Amazon to measure and analyze the performance of its services and to ensure that ads are effective and relevant.

80.      The **adnxs.com** domain is associated with AppNexus, which is owned by Microsoft Corp. Microsoft uses adnxs.com cookies to collect data on user navigation and behavior on websites, including information on user preferences and/or interaction with web-campaign content, to target advertisements.[27] The cookies include unique identifiers that help Microsoft recognize users across different websites and sessions.[28] This allows cookies set from the adnxs.com domain to collect data, including IP address, user demographic information, geographic location, page views, and interactions with websites.[29] These cookies also enable Household Attribution, a feature that enables Microsoft to match ads served on any device to website activity occurring on any device connected to the same network using the same IP address.[30] Further, the cookies enable advertisers to track the effectiveness of campaigns and avoid showing the same ads repeatedly to the same users. Microsoft uses this data to personalize ad content and track users across the internet. Adnxs.com cookies also categorize users into different segments based on their interests, demographics, or behaviors. This segmentation is

---

[27] https://cookiepedia.co.uk/host/adnxs.com.
[28] https://learn.microsoft.com/pdf?url=https%3A%2F%2Flearn.microsoft.com%2Fen-us%2Fxandr%2Fmonetize%2Ftoc.json.
[29] *Id*.; https://www.microsoft.com/en-us/privacy/privacystatement#mainpersonaldatawecollectmodule.
[30] https://learn.microsoft.com/pdf?url=https%3A%2F%2Flearn.microsoft.com%2Fen-us%2Fxandr%2Fmonetize%2Ftoc.json.

CLASS ACTION COMPLAINT

used to target specific audiences with tailored ads. The data collected by cookies set through the adnxs.com domain has allowed Microsoft to set up a platform in which advertisers can bid for and place advertisements targeted at users based on a variety of demographics, including, among other things, demography, device type, and location.[31]

81.    The **linkedin.com** domain is owned by LinkedIn Corporation—a subsidiary of Microsoft Corp. LinkedIn Corporation runs the social media-based business networking platform LinkedIn. Cookies set by the linkedin.com domain are used to target website users with advertising.[32] Specifically, cookies set by the linkedIn.com domain target users with advertising and measure the performance of such ads.[33] These cookies assign a unique ID to users' devices, which allows LinkedIn to track users across the internet, and to collect information regarding IP address, operating system, browser information, web browsing activity—including the URL of both the site the users came from before accessing the website with the linkedin.com cookies and the one to which users navigate when they leave the website with the linkedIn.com cookies—download and purchase activity, and how users interact with ads.[34] Cookies set by the linkedIn.com domain are used to target users with advertisements on and off the LinkedIn social media platform.[35]

82.    The **yahoo.com** domain is owned by Yahoo Inc., a technology company that focuses on online media and advertising. Cookies set by the yahoo.com domain are used to target website users with advertising by assigning Website users unique identifiers.[36] These cookies collect information, such as IP addresses, browser type and settings, operating system, device type, and advertising identifiers from other third parties, including Apple's ID for Advertising, Apple's ID for vendors, Google's Android ID, and Google's Play Store Ad ID.[37] Cookies are further used to support Yahoo's targeting of content and advertising and to associate users,

[31] https://learn.microsoft.com/en-us/xandr/monetize/buy-side-targeting#other-targeting-guidance.
[32] https://cookiepedia.co.uk/host/linkedin.com.
[33] https://www.linkedin.com/legal/cookie-policy.
[34] *Id*.
[35] *Id*.
[36] https://cookiepedia.co.uk/host/yahoo.com
[37] https://legal.yahoo.com/us/en/yahoo/privacy/topics/
cookies/index.html#:~:text=When%20you%20log%20in%20to,or%20device%20you%20are%20using.

CLASS ACTION COMPLAINT

devices, and accounts with each other or with those in a similar location, such as in the same household.[38] Yahoo's use of a unique identifier with its cookies allows it to track users across the internet and across different devices.[39] The purpose of Yahoo's cookies and the data it collects is to track users and target them with advertisements—the sale of which Yahoo uses to generate revenues.

83.    The **pubmatic.com** domain (and its subdomains) is associated with PubMatic, Inc., a digital advertising company.[40] PubMatic uses pubmatic.com cookies to collect data on user behavior on websites including user interactions with advertising content.[41] PubMatic uses this data to personalize advertising content and track users across the internet.[42]

84.    The **insight.adsrvr.org** domain is associated with The Trade Desk, Inc., a digital advertising company that offers a cloud-based ad-buying platform that enables businesses to plan, manage, optimize, and measure data-driven digital advertising campaigns.[43] The Trade Desk uses insight.adsrvr.org cookies to collect data on users such as their geographic locations, the type of device users are using, and users' interests as inferred from their web browsing or app usage activity."[44] This data helps The Trade Desk personalize ad content and track users across the internet.[45]

85.    The Trade Desk acknowledges that its cookies' ability "to collect, augment, analyze, use and share data relies upon the ability to uniquely identify devices across websites and applications, and to collect data about user interactions with those devices for purposes such as serving relevant ads and measuring the effectiveness of ads."[46]

86.    The **scorecardresearch.com** domain is associated with Comscore, Inc.'s Scorecard Research service, a "leading global market research effort that studies and reports on

---

[38] *Id.*
[39] *Id.*
[40] *See* www.metrixlab.com.
[41] *See*, PubMatic, Inc. Form 10-K for year ending December 31, 2023 (Filed February 28, 2024) at 17–18.
[42] *Id.*
[43] *See* The Trade Desk, Inc. 2023 Form 10-K (filed February, 15 2024).
[44] *Id.*
[45] *Id.*
[46] *Id.*

CLASS ACTION COMPLAINT

Internet trends and behavior."[47] The ds.scorecardresearch.com domain collects a user's online identifiers, ("e.g., cookie identifiers, other hardware or device identifiers, and IP addresses"), geolocation data, browsing history, operating system, browser type, website preferences, and the duration and time of the user's website access.[48] Scorecard Research then processes "the information collected . . . to draw inferences about your predicted characteristics and preferences,"[49] which it then sells to businesses "around the world."[50] Scorecard Research then sells this collected data to website owners for a profit.

87.     The **bidswitch.net** domain is associated with BidSwitch, a technology platform operated by IPONWEB GmbH that functions as middleware in the programmatic advertising ecosystem.[51] BidSwitch's cookies are not used to directly serve ads to users, but rather to facilitate the service of ads between Supply-Side Platforms (SSPs) and Demand-Side Platforms (DSPs).[52] The cookies store unique user IDs and regulate the synchronization of these IDs across different advertising services.[53] This "cookie syncing" is essential for enabling advertisers on various platforms to recognize a user and participate in real-time bidding auctions for ad space on publisher websites, effectively acting as a central hub for identity matching in the ad-tech industry.[54]

88.     The **3lift.com** domain is associated with TripleLift, Inc., an advertising technology platform that specializes in programmatic advertising.[55] TripleLift's cookies are used to assign a unique digital identifier (stored in the "TLUID" cookie) to a user's browser or device.[56] This identifier enables the tracking of users across different websites to collect data for targeted advertising, including interest-based targeting and ad performance measurement.[57] The

---

[47] ScorecardResearch website (available at https://www.scorecardresearch.com/).
[48] ScorecardResearch Privacy Policy (last updated June 1, 2023) (available at https://www.scorecardresearch.com/privacy.aspx?newlanguage=1).
[49] *Id.*
[50] ScorecardResearch About page (available at https://www.scorecardresearch.com/about.aspx?newlanguage=1).
[51] *See* https://www.bidswitch.com/.
[52] *See* https://www.bidswitch.com/privacy-policy/.
[53] *Id*.
[54] https://clearcode.cc/blog/what-is-bidswitch/.
[55] *See* https://triplelift.com/.
[56] *See* https://triplelift.com/user-rights-policy-and-opt-out/.
[57] *See* https://triplelift.com/platform-privacy-policy/.

CLASS ACTION COMPLAINT

company also leverages first-party publisher data to create audience segments, positioning this as an addition to traditional third-party cookie tracking in response to industry privacy changes.[58]

89. The **openx.net** domain is associated with OpenX Technologies, Inc., a digital advertising technology company that operates a programmatic ad exchange.[59] OpenX uses cookies to facilitate the buying and selling of digital advertising. These cookies assign unique online identifiers to users, which are used to collect data across different websites about their online activity, browsing history, and inferred interests.[60] This information enables interest-based advertising, allowing advertisers to target specific users with relevant ads. The platform also uses cookies for ad delivery management, such as controlling ad frequency, measuring campaign performance, and syncing user identifiers with other advertising partners.[61]

90. The **casalemedia.com** domain is associated with Casale Media, a digital advertising platform owned by Index Exchange, Inc., that operates as part of an ad exchange network.[62] Casale Media's cookies are used to collect data about users' website visits and online behavior, including the number of visits, time spent on sites, and pages loaded.[63] This information is used to build user profiles for the purpose of delivering targeted advertising.[64] The platform enables advertisers to segment audiences and optimize ad relevance by tracking users across multiple websites within its network, and its cookies can also be used for functions like frequency capping to limit the number of times a user is shown the same advertisement.[65]

91. The **rubiconproject.com** domain is associated with the Rubicon Project, an advertising exchange platform owned by Magnite, Inc.[66] Rubicon Project operates as a Supply-Side Platform (SSP), enabling website publishers to sell their advertising inventory through real-time bidding auctions. Its cookies are used to assign unique identifiers to users, collect data on

---

[58] *See* https://triplelift.com/resources/case-study/triplelift-audiences-exceed-benchmarks/.
[59] *See* https://www.openx.com/publishers/ad-exchange/.
[60] *See* https://www.openx.com/privacy-center/ad-exchange-privacy-policy/.
[61] *See id.*
[62] *See* https://www.indexexchange.com/about/.
[63] *See* https://www.indexexchange.com/privacy/exchange-platform-privacy-policy/.
[64] *Id.*
[65] *Id.*
[66] *See* Platform Cookie Policy - Magnite, accessed September 26, 2025, https://www.magnite.com/legal/platform-cookie-policy/.

CLASS ACTION COMPLAINT

their browsing behavior (including IP address, location, and websites visited), and facilitate the exchange of this user data with various ad services.[67] This process, known as cookie syncing, allows advertisers to identify and bid on ad impressions to target specific users across the web, forming a foundational component of the programmatic advertising ecosystem.[68]

92.     The **everesttech.net** subdomain is associated with Everest Technologies, Inc., a technology company that provides data analytics and digital services.[69] The cm.everesttech.net domain collects and transmits user data (including, "IP address, device information, browser type and settings and information about your activity on the website . . . [and] pages and files viewed, searches and other actions you take such as what features you use [on the website]."[70] Although Everest represents that such data may be used for operational purposes, it is also used for advertising, analytics, and related data-driven services.

93.     These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data— including whether a user is located in California.

**D.     The Third Parties Intercept User Communications While in Transit.**

94.     On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to the Website. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

---

[67] *See id*.; *See also* User Choice Portal | Manage Your Privacy Preferences with Magnite, accessed September 26, 2025, https://www.magnite.com/legal/user-choice-portal/.
[68] *See id*.
[69] https://www.everesttech.com/services/?c=us.
[70] *Id*.

CLASS ACTION COMPLAINT

95.     First, the Third Parties must read the data in real time in order to ***transform*** it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

96.     Second, the Third Parties read the data in real time in order to ***deduplicate*** events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[71] Third Party platforms encourage this redundant configuration and automatically compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action.[72] This deduplication occurs as the communications are received, before they are stored.

97.     Third, the Third Parties read and analyze incoming communications in real time to ***validate*** and ***filter*** the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

98.     Fourth, the Third Parties perform real-time ***analytics*** on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

---

[71] For example, Google's server-to-server API is the **Google Ads Conversion API**. Facebook's is the **Meta Conversions API**. On information and belief, each of the Third Parties uses a server-to-server API to collect user data.

[72] For example, Facebook recommends that websites use a "redundant setup" whereby "advertisers implement the Conversions API alongside their Meta Pixel." *See* "Handling Duplicate Pixel and Conversions API Events," available at https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events. Facebook confirms that its system automatically deduplicates events using various parameters included with the data, such as "event_id," "event_name," "fbp," and "external_id." *Id.*

CLASS ACTION COMPLAINT

99.    To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

100.    For example, Meta (formerly Facebook) has publicly described its proprietary real-time stream processing platform that ingests data transmitted from users' devices and websites, applies real-time transformations and personalization, and only thereafter stores the data in backend data warehouses, as illustrated in the following diagram created by Facebook:[73]



101.    As the diagram confirms, the data is sent from consumers' "Devices" and from the "Web," and then goes through the Stream Processing Pipelines **before** being stored in the data "Warehouse."

102.    Facebook's Stream Processing Pipelines perform a wide variety of real-time analytics, transformations, and AI and machine learning on the data prior to storage:[74]

---

[73] XStream: Stream Processing Platform at Facebook (video) at 1:07 (available at https://www.youtube.com/watch?v=DNI54vc1ALQ).
[74] *Id.* at 2:05.

CLASS ACTION COMPLAINT

## Use Cases @ Facebook

Diversity of Use Cases

### Stream Analytics

- **Time series analytics** – calculate metrics over time windows and stream to another Scribe category, dashboard or Scuba

- **Real time dashboards/Scuba** – aggregate and process Scribe to feed dashboards or another Scribe category

- **Real time metrics** – Custom metrics or triggers for real time monitoring, notifications or alarms

### Stream Transform

- **Clean, enrich, organize, and transform raw** Scribe prior to loading to warehouse reducing or eliminating batch ETL steps

- **Common built-in operators** to transform, aggregate, and filter streaming data

### Real-Time AI/ML

- **Enable various stages of the ML life cycle** E.g., feature engineering

- Enable **predictive analytics, fraud detection**, real-time personalization, and other advanced analytics use cases

103.    As the diagram confirms, Facebook does not merely store incoming data for later review; rather, before the data is stored, Facebook contemporaneously reads and processes it— including by reading the data, cleaning it, applying "real-time personalization" to associate it with a particular user, and analyzing its contents as necessary to generate real-time responses.

104.    On information and belief, the other Third Parties also use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage. For example, Google developed MillWheel, an internal stream processing system, as well as Flume/FlumeJava, which evolved into Google Cloud Dataflow.[75] Google Cloud Dataflow enables Google to perform many functions on real-time data at the "Ingest" phase, before it is stored.[76] Google, which sells Dataflow to third party developers for use with their own products, states that Dataflow is used "to create data pipelines that read from one or more sources, *transform the data*, and write the data to a destination."[77] One use for Dataflow

---

[75] *See, e.g.*, Google Cloud Blog, "How cloud batch and stream data processing works" (August 2020), https://cloud.google.com/blog/products/data-analytics/how-cloud-batch-and-stream-data-processing-works.
[76] Google Cloud Blog, "BigQuery explained: An overview of BigQuery's architecture" (September 2, 2020), https://cloud.google.com/blog/products/data-analytics/new-blog-series-bigquery-explained-overview.
[77] Google Cloud Documentation, "Dataflow overview," https://docs.cloud.google.com/dataflow/docs/overview (emphasis added).

- 41 -

CLASS ACTION COMPLAINT

is the "[r]eal-time machine learning (ML) analysis of streaming data."[78] Google confirms that Dataflow is "suitable for more advanced applications, such as real-time streaming analytics."[79]

105.    Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and analyzing in real time while those communications are in transit between the user's browser and Defendant's Website.

**E.    The Signaling and Addressing Information Intercepted by the Third Parties.**

106.    The "signaling" and "addressing" information captured and recorded by the Third Parties includes TCP and/or UDP port numbers associated with outgoing communications initiated by Plaintiffs' and Class Members' browsers and devices. In the context of Internet Protocol (IP) networking, port numbers function as sub-addresses that direct traffic to specific software processes. By recording these port numbers, the Third Parties identify and distinguish specific network connections and the communicating endpoints involved (e.g., a Plaintiff's or Class Member's IP address and TCP/UDP source port communicating with a Third Party's destination IP address and destination port such as 443). These port numbers constitute addressing information associated with the communications initiated by Plaintiffs' and Class Members' browsers and devices and fall within the "instruments" and "facilities" contemplated by California Penal Code § 638.50(b).

107.    The "signaling" information also includes protocol-level metadata recorded by the Third Parties during connection establishment and session management, such as the initiation and acceptance of TCP connections and the TLS handshake and negotiation metadata used to establish HTTPS sessions. This signaling information is transmitted by Plaintiffs' and Class Members' devices to initiate, coordinate, and manage electronic communications with the Third Parties. Because this metadata enables management of the connection rather than the substance

---

[78] *Id.*
[79] *Id.*

CLASS ACTION COMPLAINT

of the message, it constitutes record information regarding the characteristics of the communication, rather than communication content, and falls squarely within the statutory definition of a pen register.

108. Additionally, the Third Parties record HTTP request header metadata, such as the "Host" header and connection-management headers (e.g., "Connection" in HTTP/1.1), which function as digital "dialing" information. Just as a traditional pen register records the number dialed to reach a destination, these headers identify the intended web origin (via "Host") and specify how the client requests the connection be handled for that request (e.g., whether to keep the connection open). This header information is transmitted as part of the Plaintiffs' and Website users' HTTP requests and, together with the destination network address and port, enables the receiving Third Party to identify and log the destination and handling characteristics of Plaintiffs' and Website users' communications, separate from any underlying user input or message content.

109. Finally, the Third Parties' receiving infrastructure (e.g., servers, edge services, and/or load balancers) observes and records network-level and transport-level routing and addressing metadata associated with communications initiated by Plaintiffs' and Website users' browsers and devices. This metadata includes destination IP addresses, port identifiers (such as 443 for HTTPS), and related connection and session attributes, including connection initiation and termination timestamps, connection duration, and identifiers such as the protocol used (TCP or UDP), the source IP address, the source port, the destination IP address, and the destination port. The Third Parties use this information in real time to identify and log the origin and destination endpoints of Plaintiffs' and Website users' electronic communications and the characteristics of those connections, separate from any substantive "message" or "contents" carried at the higher-level Application layer.

**F.    The Private Communications Collected are Valuable.**

110. As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which

- 43 -

CLASS ACTION COMPLAINT

Defendant causes to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiff and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

111. The Private Communications tracked and collected through cookies on the Website are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular pizzas and then target those users with advertisements for similar products both on the Website and across unrelated third-party websites.

112. Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables Defendant to assess trends across its brands and within the broader pizza market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

113. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[80] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

114. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

---

[80] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

- 44 -

CLASS ACTION COMPLAINT

115. By falsely representing consumers' ability to decline non-required cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

**PLAINTIFFS' EXPERIENCES**

**Mikhail Gershzon**

116. Plaintiff Gershzon visited the Website to obtain information about Papa John's pizza offerings, while located in California, on one or more occasions during the last four years. During those visits, he entered an address corresponding to his location into the Website to identify nearby store locations and viewed information regarding available menu items and pricing specific to his location.

117. Plaintiff Gershzon's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Gershzon is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

118. When Plaintiff Gershzon visited the Website, it immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Cookie Settings" button. Plaintiff Gershzon viewed Defendant's representation on the popup cookie consent banner that, "Papa Johns uses cookies and other tracking to enhance your experience and analyze performance and traffic. We may also share information about your use of our site with our social media, advertising and analytics partners."

119. Plaintiff Gershzon clicked the "Cookie Settings" button. The Website then displayed to Plaintiff Gershzon the Privacy Preference Center. Defendant represented in the Privacy Preference Center that users could "opt out of using certain types of cookies…." Plaintiff Gershzon adjusted the toggle next to each category of cookies to deselect or reject all categories

CLASS ACTION COMPLAINT

of cookies, except those that were strictly required, including "Targeting Cookies," "Performance Cookies," "Functional Cookies," and "Social Media Cookies."

120. In rejecting all non-strictly required cookies, Plaintiff Gershzon gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Gershzon specifically rejected, based on Defendant's representations, "Targeting Cookies," "Performance Cookies," "Functional Cookies," and "Social Media Cookies" and those cookies that share information with third parties for those purposes. In reliance on these representations and promises, only then did Plaintiff Gershzon continue browsing the Website.

121. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, analytics, and social media, to be placed on Plaintiff Gershzon's device and/or transmitted to the Third Parties along with user data, without his knowledge. Accordingly, the popup cookie consent banner and Privacy Preference Center's representation to Plaintiff Gershzon that he could adjust the cookie settings to reject the use and/or placement of all non-strictly necessary cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Gershzon believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

122. Then, as Plaintiff Gershzon continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Gershzon's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, analytics, and social media content from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Gershzon's Private Communications as Plaintiff Gershzon browsed the Website.

CLASS ACTION COMPLAINT

123. Defendant's representations that consumers could reject all non-strictly required cookies while Plaintiff Gershzon and users browsed the Website, or at least those "Targeting Cookies," "Performance Cookies," "Functional Cookies," and "Social Media Cookies" involved in providing analytics, advertising, and functional services, were untrue. Had Plaintiff Gershzon known this fact, he would not have used the Website. Moreover, Plaintiff Gershzon reviewed the popup cookie consent banner and Privacy Preference Center prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all non-strictly required cookies, Plaintiff Gershzon would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

124. Plaintiff Gershzon continues to desire to browse content featured on the Website. Plaintiff Gershzon would like to browse websites that do not misrepresent that users can reject all non-strictly required cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all non-strictly required cookies and tracking technologies, Plaintiff Gershzon would likely browse the Website again in the future, but will not do so until then. Plaintiff Gershzon regularly visits websites that feature content similar to that of the Website. Because Plaintiff Gershzon does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all non-strictly required cookies and tracking technologies, Plaintiff Gershzon will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Gershzon is not a software developer and has not received training with respect to HTTP network calls.

CLASS ACTION COMPLAINT

**Bianca Johnston**

125. Plaintiff Johnston visited the Website to obtain information about Papa John's pizzas, while located in California, on one or more occasions during the last four years. During those visits, she entered an address corresponding to her location into the Website to identify nearby store locations and viewed information regarding available menu items and pricing specific to her location.

126. Plaintiff Johnston's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Johnston is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

127. When Plaintiff Johnston visited the Website, it immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner, which provided the option to select the "Cookie Settings" button. Plaintiff Johnston viewed Defendant's representation on the popup cookie consent banner that, "Papa Johns uses cookies and other tracking to enhance your experience and analyze performance and traffic. We may also share information about your use of our site with our social media, advertising and analytics partners."

128. Plaintiff Johnston clicked the "Cookie Settings" button. The Website then displayed to Plaintiff Johnston the Privacy Preference Center. Defendant represented in the Privacy Preference Center that users could "opt out of using certain types of cookies…." Plaintiff Johnston adjusted the toggle next to each category of cookies to deselect or reject all categories of cookies, except those that were strictly required, including "Targeting Cookies," "Performance Cookies," "Functional Cookies," and "Social Media Cookies."

129. In rejecting all non-strictly required cookies, Plaintiff Johnston gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Johnston specifically rejected, based on Defendant's representations, "Targeting Cookies," "Performance Cookies," "Functional Cookies," and "Social Media Cookies" and those cookies that share information with third parties for those

purposes. In reliance on these representations and promises, only then did Plaintiff Johnston continue browsing the Website.

130.    Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, analytics, and social media, to be placed on Plaintiff Johnston's device and/or transmitted to the Third Parties along with user data, without her knowledge. Accordingly, the popup cookie consent banner and Privacy Preference Center's representation to Plaintiff Johnston that she could adjust the cookie settings to reject the use and/or placement of all non-strictly necessary cookies and tracking technologies while she browsed the Website was false. Contrary to what Defendant made Plaintiff Johnston believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

131.    Then, as Plaintiff Johnston continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite her clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, analytics, and social media content from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Johnston's Private Communications as she browsed the Website.

132.    Defendant's representations that consumers could reject all non-strictly required cookies while Plaintiff Johnston and users browsed the Website, or at least those "Targeting Cookies," "Performance Cookies," "Functional Cookies," and "Social Media Cookies" involved in providing analytics, advertising, and functional services, were untrue. Had Plaintiff Johnston known this fact, she would not have used the Website. Moreover, Plaintiff Johnston reviewed the popup cookie consent banner and Privacy Preference Center prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all non-strictly required cookies,

CLASS ACTION COMPLAINT

Plaintiff Johnston would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

133. Plaintiff Johnston continues to desire to browse content featured on the Website. Plaintiff Johnston would like to browse websites that do not misrepresent that users can reject all non-strictly required cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all non-strictly required cookies and tracking technologies, Plaintiff Johnston would likely browse the Website again in the future, but will not do so until then. Plaintiff Johnston regularly visits websites that feature content similar to that of the Website. Because Plaintiff Johnston does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all non-strictly required cookies and tracking technologies, she will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Johnston is not a software developer and has not received training with respect to HTTP network calls.

**Daniel Wine**

134. Plaintiff Wine visited the Website to obtain information about Papa John's pizzas, while located in California, on one or more occasions during the last four years. During those visits, he entered an address corresponding to his location into the Website to identify nearby store locations and viewed information regarding available menu items and pricing specific to his location.

135. Plaintiff Wine's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Wine is not

CLASS ACTION COMPLAINT

a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

136.    When Plaintiff Wine visited the Website, it immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Cookie Settings" button. Plaintiff Wine viewed Defendant's representation on the popup cookie consent banner that, "Papa Johns uses cookies and other tracking to enhance your experience and analyze performance and traffic. We may also share information about your use of our site with our social media, advertising and analytics partners."

137.    Plaintiff Wine clicked the "Cookie Settings" button. The Website then displayed to Plaintiff Wine the Privacy Preference Center. Defendant represented in the Privacy Preference Center that users could "opt out of using certain types of cookies…." Plaintiff Wine adjusted the toggle next to each category of cookies to deselect or reject all categories of cookies, except those that were strictly required, including "Targeting Cookies," "Performance Cookies," "Functional Cookies," and "Social Media Cookies."

138.    In rejecting all non-strictly required cookies, Plaintiff Wine gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Wine specifically rejected, based on Defendant's representations, "Targeting Cookies," "Performance Cookies," "Functional Cookies," and "Social Media Cookies" and those cookies that share information with third parties for those purposes. In reliance on these representations and promises, only then did Plaintiff Wine continue browsing the Website.

139.    Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, analytics, and social media, to be placed on Plaintiff Wine's device and/or transmitted to the Third Parties along with user data, without his knowledge. Accordingly, the popup cookie consent banner and Privacy Preference Center's representation to Plaintiff Wine that he could adjust the cookie settings to reject the use and/or placement of all non-strictly necessary cookies and tracking technologies while he browsed the Website was false. Contrary

- 51 -

to what Defendant made Plaintiff Wine believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

140. Then, as Plaintiff Wine continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Wine's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, analytics, and social media content from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Wine's Private Communications as Plaintiff Wine browsed the Website.

141. Defendant's representations that consumers could reject all non-strictly required cookies while Plaintiff Wine and users browsed the Website, or at least those "Targeting Cookies," "Performance Cookies," "Functional Cookies," and "Social Media Cookies" involved in providing analytics, advertising, and functional services, were untrue. Had Plaintiff Wine known this fact, he would not have used the Website. Moreover, Plaintiff Wine reviewed the popup cookie consent banner and Privacy Preference Center prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all non-strictly required cookies, Plaintiff Wine would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

142. Plaintiff Wine continues to desire to browse content featured on the Website. Plaintiff Wine would like to browse websites that do not misrepresent that users can reject all non-strictly required cookies and tracking technologies. If the Website were programmed to honor users' requests to reject all non-strictly required cookies and tracking technologies, Plaintiff Wine would likely browse the Website again in the future, but will not do so until then. Plaintiff Wine regularly visits websites that feature content similar to that of the Website. Because Plaintiff Wine does not know how the Website is programmed, which can change over

CLASS ACTION COMPLAINT

time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all non-strictly required cookies and tracking technologies, Plaintiff Wine will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Wine is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

143.    Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

**Class**: All persons who browsed the Website in the State of California after opting out of or rejecting all non-strictly required cookies in the Privacy Preference Center.

144.    This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

145.    **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

146.    **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed

on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to reject all non-strictly required cookies and tracking technologies on the Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

147. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendant's actions violate California laws invoked herein; and

b. Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

148. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, rejected non-strictly required cookies, and had their confidential Private Communications intercepted by the Third Parties.

149. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent his interests and those of the Class. By prevailing on his claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

150. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the

CLASS ACTION COMPLAINT

Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

151. Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

152. To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

153. Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

154. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could: (i) manage their "Cookie Settings", (ii) "opt out of using certain types of cookies" and (iii) decline or reject all non-strictly required cookies and tracking technologies before proceeding to browse the Website. Plaintiffs

CLASS ACTION COMPLAINT

and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner on the Website, Plaintiffs and Class members rejected non-strictly required cookies and reasonably expected that their rejection of non-strictly required cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they rejected such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

155.    Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

156.    Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles

CLASS ACTION COMPLAINT

are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

157. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

158. Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

159. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

160. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

161. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

162. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of non-strictly required cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

CLASS ACTION COMPLAINT

**Second Cause of Action: Intrusion Upon Seclusion**

163.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

164.    To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

165.    By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

166.    The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose to reject non-strictly required cookies in the Privacy Preference Center.

167.    Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding his and their Private Communications on the Website based on Defendant's promises to users that they could: (i) manage their "Cookie Settings", (ii) "opt out of using certain types of cookies" and (iii) decline or reject all non-strictly required cookies and tracking technologies, as well as state criminal and civil laws designed to protect individual privacy.

168.    Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could (i) manage their "Cookie Settings", (ii) "opt out of using

- 58 -

CLASS ACTION COMPLAINT

certain types of cookies" and (iii) decline or reject all non-strictly required cookies and tracking technologies, when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they rejected all non-strictly required cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

169.    Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

170.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

171.    Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

172.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of non-strictly required cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Third Cause of Action**: **Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

173.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

174.    California Penal Code § 631(a) provides, in pertinent part:

- 59 -

CLASS ACTION COMPLAINT

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

175.    The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

176.    Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

177.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did **any** of the following:

[i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

[ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

- 60 -

CLASS ACTION COMPLAINT

[iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

178.    CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

179.    Defendant is a "person" within the meaning of California Penal Code § 631.

180.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

181.    The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

182.    Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

- 61 -

CLASS ACTION COMPLAINT

183. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

184. At all relevant times, the Website caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

185. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

186. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

187. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

CLASS ACTION COMPLAINT

188. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to reject non-strictly required cookies in the consent banner.

189. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located devices. In particular, Website users' California-based devices, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

190. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

191. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

192. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record,

CLASS ACTION COMPLAINT

collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to pizza products. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to reject non-strictly required cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

193.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

194.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

195.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

196.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

- 64 -
CLASS ACTION COMPLAINT

197. The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

198. At all relevant times, Defendant caused pen registers (e.g., the Third Party software code and cookies) to be placed on Plaintiffs' and Class members' browsers and devices. This software code established and maintained network connections between the users' devices and the Third Parties, and also caused cookies, user data and metadata, and addressing and networking information (including, without limitation, IP addresses, port numbers, protocol-level metadata, HTTP request header metadata, and and user-agent information), to be transmitted to the Third Parties. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

199. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

200. Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by toggling off or rejecting all non-strictly required cookies in the Privacy Preference Center and clicking "Confirm My Choices."

201. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

CLASS ACTION COMPLAINT

202.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

203.    Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

204.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

205.    Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could (i) manage their "Cookie Settings", (ii) "opt out of using certain types of cookies" and (iii) decline or reject all non-strictly required cookies and tracking technologies.

206.    However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users rejected all non-strictly required cookies (including "Targeting Cookies," "Performance Cookies," "Functional Cookies," and "Social Media Cookies") in the Privacy Preference Center. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to reject all non-strictly required cookies. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant knew, or should have known, how the Website functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating its performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Website's programming allowed the third-party cookies to be placed on users'—including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users reject all non-strictly required cookies, which Defendant promised its users they could do. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Website. In misleading

- 66 -

Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

207.    Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

208.    Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

209.    Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

210.    Defendant's representations that consumers could (i) manage their "Cookie Settings", (ii) "opt out of using certain types of cookies" and (iii) decline or reject all non-strictly required cookies and tracking technologies (including "Targeting Cookies," "Performance Cookies," "Functional Cookies," and "Social Media Cookies") was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner and Privacy Preference Center prior to their interactions with the Website. Had Defendant disclosed that it caused third-party non-strictly required cookies to be stored on Website visitors' devices that are related to personalization, advertising, analytics, and social media and/or share information with third parties even after they choose to reject all such non-strictly required cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

CLASS ACTION COMPLAINT

211. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to reject non-strictly required cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

212. Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

213. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

214. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' rejection of the Website's use of non-strictly required cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

## Sixth Cause of Action: Unjust Enrichment

215. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

216. Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

217. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentations that users could (i) manage their "Cookie Settings", (ii) "opt out of using certain types of cookies" and (iii) decline or reject all non-strictly required cookies and tracking technologies and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences,

- 68 -

CLASS ACTION COMPLAINT

shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members rejected such cookies.

218. Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendant.

219. Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

220. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

221. It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

222. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

223. Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

224. Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendant as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

- 69 -
CLASS ACTION COMPLAINT

B.      An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C.      An award of punitive damages;

D.      An award of nominal damages;

E.      An order for full restitution;

F.      An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G.      An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.      For reasonable attorneys' fees and the costs of suit incurred; and

I.      For such further relief as may be just and proper.

Dated: April 24, 2026

**GUTRIDE SAFIER LLP**


_/s/ Seth A. Safier_
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

_Attorneys for Plaintiffs_

- 70 -
CLASS ACTION COMPLAINT